The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. Please be seated. I would like to welcome everyone here today to the Fourth Circuit. We have four cases. You're fine. And we'll begin with our first case, which is Case v. Beasley, number 246953. Ms. Leff. Good morning, Your Honors. May it please the Court. I'm Allison Leff and I represent Plaintiff Appellant Brandon Case. The defendants in this case, three correctional officers, made an intentional choice that put a prisoner, Brandon Case, in danger. Because of that choice, Mr. Case was injured in exactly the way the defendants knew he might be, and he will suffer chronic pain for the rest of his life as a result. The trial court made a mistake by granting defendants summary judgment. The Court's decision overlooked facts in the record that would permit a jury to find the defendants, Brandon Beasley, Eric Ureta, and Kenny Custodio, violated Mr. Case's Eighth Amendment rights. What's more, the trial court committed a procedural error by allowing defendant Custodio to oppose Mr. Case's summary judgment motion after missing the deadline to do so and failing to show that excusable neglect justified his error. So I don't want to divert too much time on the thing you just said, but I'm trying to figure out what, let's assume that you're right. I'm just not sure what follows, because even assuming the district court was wrong to let him oppose the defendant to oppose the plaintiff's summary judgment motion. We don't grant summary judgment by default, so the court would have still had to decide whether to grant the plaintiff's summary judgment motion. And given the fact that the court ultimately granted summary judgment to the defendant, it seems pretty blindingly obvious the court was not going to grant summary judgment to the plaintiff. And then also, in cases like this, it's virtually impossible to get summary judgment as the party that would bear it. So you may be right that the court shouldn't have let... I'm just trying to figure out what is actually practically at stake with that question. Yeah, that's right, Your Honor. It is a complicated set of procedural facts. I think the... First, our position is that the court made a mistake in granting the defendant's summary judgment. So setting that aside, what should have happened is that the court should have considered plaintiff's summary judgment motion. But then obviously would have denied it, because your client bears the burden for the trial. I can't see any plausible world in which your client's getting summary judgment. So the crucial thing about the defendant's failure to respond is that under the local rules, when a party does not respond to the motion, they should consider the motion accepting those facts as true. So the idea is that the judge should have accepted the material facts that were in plaintiff's statement, and taking all those facts as true, decided the motion with that in mind. So that's what we ask that the court order, that the district court consider that motion, accepting those facts. And I think also, you're absolutely right to point out it is extremely unusual for a plaintiff in a case like this to get affirmative summary judgment. This was a very narrow motion on a very specific set of facts. So in this case, it was only a motion against one of the defendants. And the defendant had admitted a lot of things in his deposition, and also when the motion was originally filed, had failed to respond to requests to admit. So there was a set of facts that was very interesting. I will let you get off this topic in a question. I just have one, though, because this is a factual question. Are you aware of a single case in which this court has ever reversed a district court on an excusable neglect standard where all the court let a party do is respond to a motion against it? I cannot find a single case where we've ever found the district court abused its discretion in finding excusable neglect in this type of situation. I'm not aware of any such case right now. So I'll begin by discussing the Eighth Amendment issue. The dispute related to plaintiff's Eighth Amendment claim is about whether the defendants disregarded a known risk of harm. There are facts in the record, which the district court completely overlooked, that support an inference that the defendants knew there was a substantial risk of harm, and that they didn't take any reasonable steps to address the harm. The following facts would support a jury finding that defendants knew they created a serious risk of harm to general population prisoners like Brandon Case by leaving the Sally Port doors open. Each defendant had years of experience working on the unit where Case was attacked. Each defendant knew that safekeepers were a special classification of inmates that included... Counsel, can I stop you and maybe get to this point by asking it a question that will involve the facts that you're outlining there? It seems like from Farmer we know that you don't have... They do not have... The defendants aren't able to say, we had to anticipate this very specific encounter. But do they have to... Do they have to realize, subjectively realize, that when Custodio was allowing Case to... Or not stopping Case from going down the stairs, and we'll just take that one. Does he have to realize there that the safekeepers are coming up? Does he have to appreciate, not that Mr. Kenyon, I think, I may have the names wrong, was going to be there, and they had some prior beef or something. But does he have to subjectively appreciate that the safekeepers are at that moment kind of coming up there? So I think there are layers of deliberate indifference in this case, and there's a broader layer of deliberate indifference where he does not have to realize. That Kenyon is on his way. So in this case, there are facts in the record that put these defendants on notice that leaving those sally port doors open created a substantial risk of serious harm. So that is deliberate indifference in and of itself. The decision, the conscious decision just to leave those doors open, knowing that this is a unit that houses safekeepers and general population prisoners, and that those prisoners cannot mix in the hall for safety reasons. Beyond that. Would that be any different for prisoners of the general population? It is different, because this is a unit where you have safekeepers on one floor and you have general population prisoners on another floor. But the policy is not, I'm sorry to cut you off there, but the policy is about keeping doors closed isn't a safekeeper policy. It's a policy for general moving within the prison system, right? I'm sorry. I think that's, as to whether the policy pertains specifically to safekeepers, I think the sally port doors policy may be generally for safety reasons. But there's a lot of facts in the evidence that suggest that the sally port effect, as the officers called it, was important in Unit 2 because of the safekeepers and the general population prisoners. There is, for example, a memo from the defendant's supervisor, a man named John Jers, saying, I have told you over and over that the sally port effect is important in this unit to keep safekeepers and general population prisoners from meeting in the hallway. So these defendants, what Farmer asks is, are there facts that put these defendants, that put the defendants on notice? So let me just kind of try to see if I understand your position, what you said. Your position is that the fact that they knew that keeping those doors closed was important for the segregation of the general population and safekeepers. That was, it sounds like your position is awareness of that and then keeping the door open is enough. Is that your position? That's right, Judge. Okay. Let's assume I think they have to have, he has to have an awareness that the safekeepers are coming or potentially coming. What's the facts and evidence that he has that? Is it the radio call? Anything besides the radio call? Yeah, there are a few things. Custodio was stationed in the second floor booth and Beasley was, sorry, Eureta was stationed in the downstairs booth. When those safekeepers left for recreation, both of those officers saw them pass through. So the officers know when the safekeepers left for recreation and they also know, as they testified at their depositions from their years of experience working on Unit 2, that safekeeper recreation time is one hour. So they knew when to expect these safekeepers back. On top of that, Custodio, from where he's sitting in his control booth, he can see Brandon Case getting his hair cut and he can see other general populations getting their hair cut up on the second floor. And importantly, there are policies at central prison that require the safekeepers to wear different uniforms from general population prisoners. And that is another indication that the defendants knew that these populations need to be kept separate. So they can easily, there are easy visual cues for them to see who's from what group. So these defendants knew when the safekeepers left and they knew when the safekeepers were coming back. And there was the radio call. And there was the radio call, exactly. Can I ask you about Cox? And this arguably goes to either constitutional violation or clearly established. But the most obvious distinction to me between Cox and this case is that in Cox, so there's two questions. Like, do we have to know who's at risk and do we have to know who might hurt them? I think Farmer says pretty clearly we don't have to know who might hurt them. That's a pretty important thing that Farmer says. But the second question is that in Cox, this is the situation where the individual in question is saying, I am afraid that my safety is in danger. So that the identity of the party that might be harmed was specifically flagged to the officers ahead of time. I don't think we have that here. Is that factually correct, that we don't have evidence that there was notice that this specific individual was at risk? Not beyond his membership. I assume your view is that that does not matter. Could you please give me your best, why does that not matter, either at the constitutional violation or the clearly established case? So I think Farmer addresses both of those issues that you've raised. And under Farmer, you don't need to know who is likely to be the attacker. And you also don't need to know who is likely to be the victim. Is that true? Because in Farmer, we definitely knew who was at risk. I mean, it was very clear in Farmer who was at risk in Farmer. That is true. You're right. Farmer instructs, the question under the Eighth Amendment is whether the prison officials acting with deliberate indifference exposed a prisoner to a sufficiently substantial risk of serious damage to his future health. And it does not matter whether the risk comes from a single source or multiple sources. Any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him, or because all prisoners in his situation face such a risk. And that's at 843 in Farmer. And you would say that, okay, so in Farmer, it would be, that's not the language the court uses, but in Farmer, persons in his situation would be all trans prisoners. And so here you would say all people in his situation are people going up and down the stairs at this time? Is that, who are the people in his situation here? General population prisoners who live in Unit 2 alongside safe keepers and are protected by those Sally Port doors being closed so that they can't pass in the hallway at the same time. Because anyone who's somewhere else isn't at risk. And so this wouldn't work to give notice vis-a-vis them. Like prisoners in a different prison in a different cell block, that those wouldn't be people in the same situation? That's right. The district court also overlooked facts that support the inference that defendants consciously disregarded the risk. Custodio testified that he chose to leave the door to the stairwell open for an extended period because he didn't want to be bothered by repeated requests to open the door while haircuts were going on. Eureta testified to the same thing. Beasley and Custodio left the doors open after there was evidence in the record to support that they received a radio call that the safe keepers were on their way in. And at that point, as we talked about before, Custodio could see case in the hall. Let's talk about the radio call. I want to make sure I spent some time with it, but you know the record better than I do. Was that Officer Smith who testified about giving the radio call? What's the name of that officer? So there were two officers who were escorting the safe keepers. One was Smith, and the other officer is, I'm forgetting her name. Well, I'm not so worried about their names. But I'm pretty sure that all the defendant officers, when asked, all said they did not hear a radio signal, a radio message coming in. And the officer who gave or would have given the radio call, reading the testimony as a whole, is this fair? Indicated that they gave a call, but then when press said, my custom is to give a call. That's right. Cassie Black initially testified that she gave a call, and then later in her deposition she said she can't think of any reason why she wouldn't have. And Smith testified that there was a call. But Smith didn't give it, so Smith would have heard it, is that right? That's right. And I think the important point here is that there are facts that would support an inference that there was a radio call, and there are facts in this record that would support an inference that there wasn't a radio call, including the defendant's testimony that they didn't hear it. And that is why this issue can't be resolved at summary judgment. A fact finder needs to hear these facts and decide which testimony to credit, which evidence to credit. Can I ask you one thing about the video? I was a little confused by the district court's treatment of the video. So the court basically says, like, I can't, I mean, this part's good, I can't conclude anything clearly enough from the video to conclude that the officers just win under Scott v. Harris, and that seems right to me. But then the court says, and for that reason I'm not considering the video, and that's the part that's a bit of a head scratcher for me, because just because this isn't a Scott v. Harris case doesn't mean the video's not relevant at summary judgment, right? Your Honor, I see my time has expired. Yeah, I think that's exactly right. I think the video is a highlight. Like, it could help you defeat summary, even if it doesn't get them summary judgment, it could help you defeat summary judgment. I'm not saying it does or doesn't, but it could, right? I think the video is among many pieces of evidence that the district court failed to consider, and that the video does create evidence on which a jury could find in favor of plaintiffs. Well, then could I ask, what in the video do you think helps you avoid summary judgment? That taken in the light most favorable to your client helps you avoid summary judgment. What's that in the video? The video undercuts testimony, any evidence by the defendants that they didn't know that there was acute risk at this particular moment. So, for example, if Custodio were to say, I didn't know that there were safekeepers, that Brandon Case was still in the hall when the safekeepers were coming in, the video shows very clearly Custodio in his booth as Case is getting his haircut. It shows that there was a risk. It doesn't show Custodio knew that. The video actually... Tell me how it does. I mean, I think Custodio is saying, look, I know the policy. It was when people were coming and going so much, practically following the policy is too burdensome or too much trouble and really not worth the risk, plainly probably negligent, plainly a violation of the policy. But if you have to show he made that decision with knowledge that the safekeepers were in the area, I don't see how the video makes a difference on that. Farmer and the cases that follow it are very clear that circumstantial evidence of a substantial knowledge of risk is relevant. So the video is a piece of circumstantial evidence that Custodio could see that there were general population prisoners in the hall. The video also starts a few minutes before the... If Custodio was on the second floor, how could he see that there were safekeepers anywhere when Case was going down? That's right, Your Honor. Custodio could see that Case was in the hall. And then that evidence has to be taken alongside the radio call and his knowledge of the timing. I know that your time is up, but I wanted you to address the qualified immunity issue. The district court ruled incorrectly on both prongs of the qualified immunity analysis for the reasons that we've already discussed. There is evidence in the record that would make out a violation of Case's Eighth Amendment right. In terms of the clearly established prong, I think we would say two things. The first is that this case fits the exception that's explained in King, where the court doesn't need to reach the clearly established analysis because qualified immunity doesn't protect defendants who knowingly violate the law. And even if the court were inclined to reach the clearly established prong of the qualified immunity analysis, the constitutional right at issue here is a prisoner's Eighth Amendment right to be protected from violence committed by other prisoners. The right is defined that way in Cox, in McDussey, in Dancer, and in Farmer. And this case is like Cox. So your position is that that description of the right at that level of generality is established by this court as an appropriate right? That's right. And that's the way the right is described in cases that grant qualified immunity and in cases that deny it. What do you say about King v. Riley, that that's just wrong? I think the way the right was described in King v. Riley is not as faithful to the Supreme Court precedent in Farmer as Cox, McDussey, and Dancer, which defined it differently. So we shouldn't follow King? Because if we follow King, you're wrong. So I guess you're telling us that we can't follow King. I think you could follow the mandate in King where you have an intentional violation of Eighth Amendment rights. I understand that. Assume I don't agree with you on that, that you have to show clearly established. You seem to be saying King is not something we can rely on. I am saying that. I'm saying in terms of defining the right that's at issue here, this court should follow Cox, McDussey, and Dancer, which was a case that granted qualified immunity in its definition of the right. Thank you. Judge Barnard, anything else? No. Thank you, counsel. Do you have some time left? Thank you, sir. Whenever you're ready, we're ready as well. Thank you, Your Honor. May it please the court, I'm Locke Miller-Holland, here for Defendant Apeliz, Beasley, Custodio, and Urieta. And deliberate indifference is a high bar to show, and abuse of discretion is an even higher bar. And in this case, Mr. Case cannot meet either showing. Under deliberate indifference, Mr. Case is trying to show that when attacked out of the blue by another inmate, it rises to the level of constitutional violation, merely because his attacker was a safekeeper and he was a general population inmate. And that is not enough. Safekeepers, Your Honor, are a classification of prisoners based on being pretrial detainees. And for inmate purposes, that means that they are 14th Amendment prisoners or inmates versus 8th Amendment prisoners. The 8th Amendment prisoners are under the standard of cruel and unusual punishments because they've been convicted to a sentence where they can be punished, as long as it's not cruel and unusual. And the 14th Amendment inmates are under a due process standard. And so when they're there awaiting trial, they're kept separate because they can't be in the same programs as the general population inmates, and they can't be otherwise punished. And if they were allowed to mix into a homogenous group, then it would be hard to say that the pretrial detainees are not being punished. So, Counsel, appreciating that, does the record give an indication that safety is part of the reason for the segregation of pretrial detainees in the general population? Your Honor, the record indicates that safety is a consideration in the prison population as a whole. And specifically as to safekeepers, the record looks to the policy of C.1600, where it shows that the categories of safekeepers are a number of different reasons. One is that because they are a group of prisoners who are so violent that the jail cannot contain them, but they're also there for medical reasons, and there are also safekeepers there because that particular inmate is at risk from dangers at the prison, at the jail where they were originally held. And there are also safekeepers who need to be kept there because they need to be kept away from their co-defendants. So your position is that the safekeepers are there for different reasons, which I think is, there's evidence to show that in the record. But isn't that just another fact that should be considered by the jury? In other words, is the fact that the safekeepers are there for a different reason relevant to our Eighth Amendment analysis, or does that just simply create a new fact? It's relevant to the Eighth Amendment analysis because it shows that the safekeepers as a group are not a group of inmates that represent a general population. They are a group of inmates that represent a general population. And that goes back to the Farmer v. Brennan standard. Before Farmer, you had to know a specific threat to a specific inmate, but Farmer broadened it in two ways. And one is if it's a vulnerable member of a population that's a member of a vulnerable group, like a transgender inmate. And the other is if it's a risk that's so obvious it must be recognized. And that's must be rather than should be because you have to get beyond mere negligence. And in order to get to must be so obvious, it has to be longstanding, pervasive, and documented. What about the memo that says, I've told people over and over and over again not to do this, this is a bad idea, we need to not do this. This sounds like it's obvious and longstanding when literally a prison official says, as I've repeatedly told you, you can't keep doing this. An analogy for that is if you're in the house and the mother's telling the son, don't keep leaving the door open, the cat's going to get out. Don't keep leaving the door open, the cat's going to get out. And then one time they leave the door open and they get robbed. And then they come home, the mom says, I told you time and time again, don't leave the door open. And so that after the fact admonishment that, hey, you kept leaving these salad board doors open, and I've told you not to do it. But the memo talks about safety, so the analogy there would work, maybe, except for the fact that the memo at issue in this case says, I've told you repeatedly to keep the doors open, because safe keepers. So I don't understand how that analogy helps you at all. It helps because part of that reason was to keep safe keepers separate. The memo mentions safe keepers. But it is keeping safe keepers who are on the top floor separated from general population prisoners. Which is exactly what wasn't done here. Yes, Your Honor. But again, they are separated for 14th Amendment reasons and not 8th Amendment reasons. I just don't, I mean, this is all over your briefs, it's all over the district court's opinion, and I mean this as sincerely as I can. I literally don't understand this not all safe keepers are violent argument. I don't see how that helps you. Like, let's posit that that's, I mean, the only question that obviously leads to me is if some of these folks are really violent and some of them are not violent, I'm not really sure why you're holding the two of them together, but that's a separate question. That would be a question that an individual, if a non-violent safe keeper were attacked by a violent safe keeper, that might inform the claim that the non-violent safe keeper, but that's not the issue here. But I just genuinely don't understand, like, I guess I've been trying to think of an analogy for why this doesn't make any sense to me, that, like, say, I'm going to put you in a room and there's 100 people, I'm going to lock you in a room with 100 people. So the good news is that 85 of those people are lovely, peaceful, non-violent people, but 15 of them are super violent. But the good news is 85 of the 100 are not super violent, so it's no big deal that I'm going to lock you in the room with the 15 people who are super violent. I just don't understand how the fact that some, most, many safe keepers aren't violent really helps you in a world in which it seems undisputable. It's abundantly clear from the record that at least some of them are really violent. Yes, Your Honor, but the full category is that they're so violent the jail cannot contain them. And I'll use an exaggerated analogy from the Andy Griffith show where in Mayberry the jail was situated so that Otis could come in and let himself in and out of jail when he needed to. And in North Carolina we have 100 counties and Wake County has a million people and Mecklenburg has more than a million people. But when there is also Stanley County that has a total population of 60 to 70,000 and Graham County where the county seat has a population of less than 1,000, those jails are not going to be of the same caliber that Mecklenburg and Wake County would have. And so those jails may not be equipped to handle prisoners who are of the more violent variety. But when they're put into the Department of Adult Correction with the statewide resources and prison facilities, they can be adequately contained in there even when they're mixed with the medical detainees. These sound like great defenses that you might have on the merits. I don't understand how you get summary judgment based on any of this. Because the officers don't have knowledge that the safekeepers are going to be any more violent than the regular population. So counsel, that's one argument that just the nature of the safekeepers doesn't give you sufficient knowledge. Is another argument that none of the defendants were aware at that time that the safekeepers were going to be in the hallway with case or adjacent or in the same area? Is that part of your argument? Yes, Your Honor. And if it is, talk about that. There's two parts to that question I want you to address. One is, is that a fair argument given Farmer? Is that distinguishable from what Farmer says you can't consider? So if you could answer that, let's do that first. Yes, Your Honor, that is part of the argument because even if you have facts that should give you actual knowledge, then that actual knowledge, you must also draw the inference. Addressing your point, Mr. Case's argument relies on stacking inferences. And under the Kuhn case cited, even though that's an ADA case, it says stacking inferences is not the way to prove deliberate indifference. And that stacking of inferences is relying on defendants knowing when the safekeepers went out for recreation, knowing when they went outside. Which there definitely is evidence that would support that finding, right? You're not disputing that there's evidence from which a reasonable fact finder could find the defendants knew when they went outside? Well, the record isn't clear for that, but that would be... There is competent evidence in the record that would allow a jury to find that the defendants knew when the safekeepers went outside, right? A jury who believed the plaintiff's evidence could find that, right? Maybe. My fundamental take is that their argument basically seems to be, and I have some inclination, is that what the district court is basically doing is skipping to the end and predicting that the defendants are going to win. But that's not how summary judgment works. Summary judgment is, let's assume for the sake of argument that every piece of competent evidence they offer, the jury believes. And that the jury then draws every possible inference that's reasonable. And every single time there's a dispute between you and them, the jury believes them and disbelieves you. Because the only way to get summary judgment is that even assuming all those things happen, the jury still has to find in your favor. And there's a flavor to both your argument and the district court's argument that I just don't feel like that's what we're actually doing here. Even if they knew when the safekeepers went out, safekeepers come back in about an hour. But then we have testimony that there was a radio call, and I have two different officers test... I have evidence that a radio call was made that the jury could credit. And I also have two different correctional officials testifying. In my experience, you can hear these calls throughout the entire building. Now, again, maybe a jury doesn't believe that. Maybe the defendants have good arguments at trial, like it was really loud, it was really chaotic, I couldn't hear. That's fine. And maybe they win on that issue. But I don't understand how, in light of testimony that a call was made, and two different officers testifying, in my experience, you can hear these calls throughout the building, how a jury couldn't find that a call was made and a call was heard, notwithstanding the defendants' understandable claim that they didn't hear it. As part of that, the deposition of Smith, he says that sometimes the calls are made, but because of the structure of the building, they don't carry. Right. And maybe you could argue that, and maybe the jury believes that's what happened in this instance. But that, again, does not sound like summary judgment standard to me. Following up on that, it seems to me you have a fair argument that maybe they knew where they came out, but the coming back is not a known thing. The radio call is the thing that might create that sort of knowledge. And they all deny it. The officer who supposedly gave it said they gave it, said made the call, but then kind of said, well, I just generally make the call. And I think if you have that, then maybe that's not enough, even under Judge Hyten's scenario. But the other officer says, yeah, the call was made. That's the part that, if that wasn't there, maybe that call doesn't come into play. But with that statement, that's part of the record, right? Yes, Your Honor. Even if the call was made, and even if the call was received, there's still not enough to get beyond just the passing in the hallway is a general risk Well, let's assume, I understand that argument. And I think that goes back to your first one about the nature of safe keepers, and I hear you on that. But can you move to qualified immunity? For my purposes, I'm more interested in the clearly established analysis. I know there's an argument that that doesn't have to be applied, and you disagree with that. I'm going to assume I'm with you on that. Help me understand how we define the right. Your colleague says you define the right with, I think, a pretty broad principle that there's a duty to keep prisoners safe from injuries from other prisoners. She cites several cases that articulate that. And she says that King v. Riley should be disregarded. How do you explain your position in light of all those cases? Your Honor, King v. Riley is a 2023 case, and that is a recent decision. But she's basically saying that that conflicts with prior precedent. Being recent doesn't work if it conflicts with prior precedent. She's basically saying we should disregard that case as invalid because it deviates from our precedent. Well, of course, clearly established is a spectrum. And under Farmer, every case of inmate-on-inmate violence would be. And that's obviously not where it needs to go. And so there does need to be some specificity. And in the other cases, Agnesy, for one, that was a vulnerable population member. And so Cox v. Quinn was another one where there was direct knowledge. I'm sorry to cut you off, counsel, but I can appreciate the facts of this case are different from those cases. And that would matter if you have to have a clearly established right that is more specific. But the plaintiffs are saying you don't have to do that. They say King v. Riley may say that, but we should throw that out the window basically because it conflicts with prior precedent. What's your position on that? Well, this mirrors King v. Riley because King v. Riley said that this court here is constitutional violations, not policy violations. And in King v. Riley, the officer was not following policy by not looking into the window when making security checks. And here they were not following policy to keep the Sallyport doors shut. I'm not asking my question well because what I'm trying to get you to respond to is not to analogize this case to King v. Riley, but respond to your opposing counsel's position that we should not even consider that because it's inconsistent with prior precedent. Why is it not inconsistent with prior precedent if you think that's the case? Because King v. Riley, one, is more recent, and so that represents the direction that the court is deciding to go. And it does indicate that the courts want a more clearly defined right, even if the previous decisions were not as clearly defined and more broader. And so I believe that King v. Riley needs to stand as being the most recent interpretation and the direction that this court wants to take with defining clearly established. I have a different topic. Can I take you to the, again, given what I said with your colleague, I'm not sure why this, if this ultimately matters, and if so, how it matters. On what grounds was the failure to respond to the plaintiff's summary judgment motion excusable neglect? Just plumb forgot is not a theory of excusable neglect that I'm familiar with. I mean, I think the district court judge was extremely kind in letting you file that. Whether it was reversible error to let you do it, this does not seem like excusable neglect even plausibly to me. Well, when the courts have found neglect... I'm not asking what other courts have said. I'm asking you to explain to me why this was excusable neglect. Mr. Nichols is a very intelligent litigator. He came from a big firm and... My lawyer screwed up is not generally viewed as excusable neglect. He was in the process of transitioning to another job. My lawyer has a lot of other responsibilities is not generally viewed as excusable neglect. And so he did not have access to his equipment. So the new attorney who was substituting in, as soon as he noticed that the extension needed to be filed, he filed it. And then he simultaneously filed the motion to have that deemed timely. And the district court gave, like, no reasons, right? We've said there's like a three-factor test district courts are supposed to consider in deciding whether it's an excusable neglect. And here the district court is like, nah, I'll just let you do it. No analysis of the fine-air factors of why I should let you do it. Just let you do it. They did cite to the Calicop Preparatory Academy case... You can finish, sir. That's pretty loud. But we hear you. We all heard it. It's a little louder than the MP3 I got as a test. So the Calicop Preparatory Academy case was deciding in strong favor of having cases decided on their merits and that there's no prejudice in a plaintiff having to litigate their case on the merits. And in a lot of these motions for extensions of time, some of the orders granting them are cursory and for good cause shown in the motions granted. So I think we can recognize that the facts were included in the motion and that those were taken into consideration when Judge Dever was using his discretion to allow this case to be heard on the merits and allowing the extension of time to be granted. Thank you. Any other questions? I just want to address two points that were raised during that argument. The first has to do with whether it's a fair argument that the nature of the safekeepers didn't give rise to sufficient knowledge and whether none of the defendants were aware that the safekeepers were on their way at the actual moment that they came in. You understand those are two separate questions. I mean, I think you got a strong argument on the first one. I think the other one, to me, hinges a lot on that radio call, but you may convince me otherwise. So I do understand. Those are two separate pieces of circumstantial evidence that there was subjective knowledge in this case. And I think the important point about both of those arguments is that they are both fact questions, that there is evidence in the record to support inferences in plaintiff's favor on both of those points, and there is evidence that supports the defense. And we need a jury to decide both of those questions because of those facts. The existence of those facts makes summary judgment inappropriate. So that's the first point that I wanted to make. The second argument that I wanted to address was Your Honor's questions about King v. Riley. I do not think we need to throw King v. Riley out to decide this case in favor of the appellant. I think one of the important points about the qualified immunity analysis in the district court's order is that the court does not actually define the right for purpose of its analysis. It simply says there was no previously established right. You did. You said that the right is that general right not to be injured by other inmates, right? That's right. And that is the way that district court opinions that have analyzed qualified immunity have defined that right. But that's the thing that King, I'm looking at King right now, that's the thing that King says. We cannot define the right at that level of generality. That's right. And King may define the right as the right to safety checks that include looking through a cell door window. Which I think is arguably much more narrow than the precedent. But my point for this court is that what this court is asking is whether the district court correctly defined the right in this case. Maybe. But we can resolve this case. Maybe the district court didn't do it perfectly. But if King's right that your articulation of the right is just cannot be correct under qualified immunity, then it's got to be something else, right? It's got to be something more specific. That's right. And we don't know what the district court had in its mind when it decided. You're the plaintiff. So if you're articulating a right that is wrong, then how do you survive the qualified immunity defense? Yeah, that's right, Your Honor. And I think what we're saying is the court can define the right as we encourage the court to do, because that is how it is defined in Farmer. That's how it's defined in Cox and McDessie and in Dancer. And the result of that is that I do have to throw King out the window. Because King says not to do what you're telling us to do. I think that's right, Your Honor. King did not faithfully adhere, in our opinion, to the precedence of this court or to the Supreme Court in Farmer. On the question of how at what level of generality you define the right? That's right. Well, except it's not just Farmer. So the thing that the Supreme Court has said over and over again is there's like what the right is, and then there's how the right's defined for prong two of qualified immunity. And the thing the Supreme Court has said over and over again is those are not the same question. And I guess Farmer's not a qualified immunity case, right? That's right, Farmer is not. So Farmer's defining the right for purposes of the right, not for purposes of qualified immunity, right? That's correct. That's correct. And in terms of defining the right for the clearly established prong of the qualified immunity analysis, we would ask that the court look to Cox, look to Dancer, look to MacDessy. All of those cases define the right in the way that we're encouraging here. And the difference between, on the facts, the difference between this case and King is that King relies heavily on like, I'll say broadly speaking. King is a case where it's like they did some stuff. The question is whether they did enough stuff and whether the stuff they did was good enough. This is a case, or at least as you frame it or propose that we frame it as, this is a case where they did nothing, right? And so we're not debating about like whether their efforts to keep people separate were, because look, you could make efforts to keep people separate, and those efforts could fail. Like there's a variety of reasons why efforts to keep people separate might fail. And then you'd say that's a King case about like whether the thing we did is enough to prevent the bad thing from happening. But why, following up on that, I mean, why aren't we in that very same situation? I mean, it's a broader situation than King because we're doing an actual check of the prisons and is checking enough or is looking inside. But I mean, you can't really say they didn't do anything to segregate the prisoners. I mean, they escorted them out, the safekeepers out together. They were bringing them back in together. For sure, they didn't do the policy with the door, but why is that not analogous to looking inside the cell as opposed to general things? It seems to me. Your Honor, I see my time has expired. May I respond? I think King is a case of negligence where there was a known risk of serious harm, and the officer tried to abate that risk by doing the safety checks, but did it negligently, and then there was harm. In this case, there's a known risk of substantial serious harm to the defendants. Sorry, there's a known risk of harm because the sally port doors are open and the safekeepers are moving through the halls and the general population of prisoners are moving through the halls. The defendants know about this risk, but they do not close those doors, and they don't look down the hall. They don't hold the case. I appreciate that. I'm sorry to cut you off, but is it right that the only right you've articulated as a right for the clearly established form of qualified immunity is the broad right that we talked about earlier? You've not offered below or in briefs any more specific right, correct? That's correct. Thank you. Okay, great. Thanks to both counsel. We'll take this matter under advisement, and we'll come down and greet counsel and proceed to our next matter.
judges: A. Marvin Quattlebaum Jr., Toby J. Heytens, Nicole G. Berner